UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE GEORGE GREER,<br><br>                                    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                                    Defendant. | Case No.:  16cv1277-WQH (PCL)<br><br>**REPORT AND<br>RECOMMENDATION OF U.S.<br>MAGISTRATE JUDGE RE:**<br><br>**PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT [Doc. 17];<br>and**<br><br>**DEFENDANT'S CROSSMOTION<br>FOR SUMMARY JUDGMENT [Doc.<br>21]** |

## I. INTRODUCTION

Plaintiff Valerie George Greer has filed a complaint seeking judicial review of Defendant Social Security commissioner Carolyn W. Colvin's denial of her application for Disability Insurance Benefits under the Social Security Act. (Doc. 1.) Plaintiff has filed a Motion for Summary Judgment (Doc. 17.), and Defendant filed a Cross Motion for Summary Judgment (Doc. 21.) Plaintiff did not file an oppositional reply. (Doc. 22.) For the reasons set forth below, the Court recommends that Plaintiff's motion be DENIED and that the Defendant's motion be GRANTED.

1

## II. PROCEDURAL HISTORY

On October 12, 2010, Plaintiff filed an application for Disability Insurance pursuant to Title II of the Social Security Act, alleging disability beginning August 11, 2009. (A.R. 253-59.) Plaintiff's applications were denied initially and upon reconsideration. (A.R. 77-86, 107-111.) Thereafter, Plaintiff filed a written request for a hearing. (A.R. 125-26.) Administrative Law Judge (ALJ") Larry B. Parker held a hearing on August 9, 2012. (A.R. 59-76.) On August 28, 2012, ALJ Parker issued a written decision finding that Plaintiff was not disabled from the alleged onset date through her date last insured. (A.R. 87-101.) After considering all the evidence in the record as a whole, ALJ Parker found:

1. Plaintiff met the insured status requirements of the Social Security Act through September 30, 2009. (A.R. 92.)

2. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of August 11, 2009 through her date last insured. (A.R. 92.)

3. Plaintiff had the following severe impairments: status post left lateral ankle ligament reconstruction and peroneal debridement; complex regional pain syndrome of the left lower extremity; chronic low back pain; and osteoarthritis of the MCP joint of the first toe bilaterally. (A.R. 92.)

4. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 93.)

5. Through the date last insured, Plaintiff retained the residual functional capacity to perform sedentary exertional work with the ability to lift 10 pounds frequently and 20 pounds occasionally; sit for a total of 6 hours in an 8-hour workday; stand or walk for a total of 4 hours in an 8-hour workday; occasionally bend; no climbing ropes; and no exposure to unprotected heights. (A.R. 93.)

6. Through the date last insured, Plaintiff was capable of performing past relevant work as a receptionist as this work did not require performing work-related activities precluded by Plaintiff's residual functional capacity. (A.R. 95.)

7. Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from August 11, 2009, the alleged onset date, through September 30, 2009, the date last insured. (A.R. 95.)

Plaintiff appealed ALJ Parker's decision to the Appeals Council. (A.R. 102-05.) On January 8, 2014, the Appeals Council vacated ALJ Parker's decision and remanded the case back to an ALJ for resolution. (Id.) Specifically, the Appeals Council instructed an ALJ to:

1. Give further consideration to the nontreating source opinion and explain the weight given to the evidence;

2. Give further consideration to Plaintiff's maximum residual functional capacity and provide appropriate rational with specific references to evidence of record in support of the assessed limitations;

3. Obtain supplemental evidence from a medical expert to clarify the nature and severity of Plaintiff's impairment and possible date of onset, if warranted and available; and

4. Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base, if warranted by the expanded record.

(A.R. 104.)

Plaintiff next appeared before ALJ Eric V. Benham, who held a hearing on July 17, 2014. (A.R. 27-57.) On September 29, 2014, ALJ Benham found Plaintiff not disabled. (A.R. 10-26.) In his decision, ALJ Benham made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2009. (A.R. 15.)

2. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of August 11, 2009, through her date last insured of September 30, 2009. (A.R. 15.)

3. Through the date last insured, Plaintiff had the following severe impairment: Left ankle sprain and strain. (A.R. 15.)

4. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 16.)

5. Plaintiff retained the residual functional capacity to perform light and sedentary work as defined in 20 CFR 404.1567(a) and (b) except the claimant retained the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 2 hours in an 8 hour workday; sit 6 hours in an 8 hour day; and occasionally stoop, crouch, kneel, crawl and climb stairs. (A.R. 16.)

6. Through the date last insured, Plaintiff was capable of performing past relevant work as a receptionist as this work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity. (A.R. 19.)

7. Plaintiff was not under a disability, as defined in the Social Security act, at any time from August 11, 2009, the alleged onset date, through September 30, 2009, the date last insured. (A.R. 20.)

Plaintiff requested a review of ALJ Benham's decision by the Appeals Council, which was denied on March 31, 2016, making ALJ Benham's decision the final determination of the Commissioner of Social Security for purposes of judicial review. (A.R. 1-6.)

On May 27, 2016, Plaintiff filed the instant suit pursuant to 42 U.S.C. §405(g).

### III. ADMINISTRATIVE RECORD

Plaintiff is fifty-two years old and weighs 105 pounds. (A.R. 376.) She worked from 1995 to 1997 as a certified nurse assistant and then as a receptionist at a church from 1998 to 2001. (A.R. 289.) Plaintiff also worked as a receptionist at a casino in 2004. From 2006 to 2007 Plaintiff served as a teacher assistant and then as a receptionist for a property management company in 2008. (Id.)

///

4

A. Medical Evidence

Plaintiff's date last insured is September 30, 2009. As such, she must establish that she was disabled on or before that date to be found disabled for the purposes of this disability claim. In an effort to organize and summarize a lengthy medical record, the evidence is split into two sections: those records relating to the period before Plaintiff's date last insured, and those relating to the period after.

1. Medical Evidence before September 30, 2009

Plaintiff saw Dr. Gordon V. Skeoch, M.D., on August 12, 2009, one day after she fell at a Walmart, injuring her left leg, back, and shoulder. (A.R. 382.) Dr. Skeoch referred her for testing at California Imaging and Diagnostics, which showed no ankle fracture or dislocation, a minimal hallux valgus deformity suggested and slight degenerative joint disease of the big toe. (A.R. 382–83.) The test also showed that the bony structures in the ankle appeared intact. (A.R. 384.)

Plaintiff was examined by Podiatrist Julie Miller, DPM, on September 18, 2009. (A.R. 447-67.) Dr. Miller suggested Plaintiff use a CAM walker and ordered foot x-rays to rule out a fracture. (A.R. 457.) A September 22, 2009 x-ray of her left foot indicated that Plaintiff suffered a sprain and had slight dorsal swelling without acute fracture or dislocation. (A.R. 458.) Three days later Plaintiff again visited Dr. Miller to discuss the results of her x-ray. (A.R. 459.) Dr. Miller recommended that Plaintiff continue using the CAM walker and crutches if needed, continue icing and elevating her ankle and elevate it as necessary. (Id.) At an October 2, 2009 follow up visit Dr. Miller ordered physical therapy twice a week to decrease pain and swelling and increase strength and mobility. (A.R. 460.) On November 30, 2009, Dr. Miller notes that Plaintiff's strength was a 5/5 and that Plaintiff had minimal tenderness with no anterior subluxation of the peroneal tendons. (A.R. 461.)

On October 20, 2009, Plaintiff was seen by Dr. Kenneth Jung, M.D., at the Kerlan-Jobe Orthopaedic Clinic. (A.R. 362–80.) Plaintiff stated she was experiencing sharp and throbbing pain, swelling, tenderness, and difficulty walking. (A.R. 376.) Upon examination, Dr. Jung found the left ankle revealed pain laterally over the anterior

talofibular ligament and peroneals; but that the peroneals were stable. (A.R. 379.) X-rays showed no fractures or dislocations, but Plaintiff had a lateral osteochondroma of the third metatarsal. (A.R. 380.) Dr. Jung diagnosed Plaintiff with an ankle sprain and peroneal strain. (Id.) Dr. Jung recommended an MRI and to continue using a boot. (Id.)

On November 6, 2009, Plaintiff saw Dr. Jung for a follow-up appointment. (A.R. 368–74.) Plaintiff stated she was experiencing swelling and pain. (A.R. 368.) The MRI results did not clearly show the peroneus longus, and as such a second MRI was requested. (A.R. 370, 372.) On examination, Dr. Jung found the point tender distal to the fibula region of the peroneal tendons, and that Plaintiff had exquisite tenderness. (Id.) Dr. Jung recommended Plaintiff continue using a boot. (A.R. 370.)

Plaintiff again saw Dr. Jung on November 13, 2009. (A.R. 362–64.) Plaintiff stated her ankle was very painful, and she exhibited some swelling. (A.R. 362.) In reviewing Plaintiff's MRI films and report, Dr. Jung did not see tears of the peroneus longus or brevis. (A.R. 365.) Dr. Jung recommended that Plaintiff wean from the boot and prescribed physical therapy. (Id.)

### 2. Medical Evidence after September 30, 2009

On December 15, 2009, Plaintiff began physical therapy at Rancho Physical Therapy. (A.R. 387-429.) At her first appointment Plaintiff reported experiencing constant aching in her left ankle, to which she had been applying ice and heat. (A.R. 395.) Plaintiff had not taken medication for her ankle. (Id.) At her next appointment two days later, treatment notes indicate that Plaintiff was already experiencing increased mobility. (A.R. 400.) Plaintiff continued to attend regular physical therapy and experienced some periods of relief despite continued soreness through her last recorded visit on January 18, 2010. (A.R. 427-29.)

Notes from a visit with Dr. Lisa Skinner, M.D., report that at a January 4, 2010 visit, Plaintiff rated her pain five out of ten, but that it was aggravated by walking. (A.R. 501.) Further, Plaintiff reported that she had experienced some improvement due to physical therapy. (Id.) At a May 19, 2010 appointment Dr. Laura D. Gridley, M.D., indicated that

Plaintiff displayed a normal range of motion, no swelling, no skin discoloration, and a normal pulse in her left ankle. (A.R. 495.) Dr. Gridley recommended a soft ankle brace, ice, and meloxicam, a pain medicine used to reduce pain and swelling in joints. (Id.) Plaintiff reported during a May 21, 2010 visit with Dr. Patrick F. Serynek, M.D., that despite no fracture being found on numerous x-rays, she was still experiencing pain that radiated from her ankle up her left leg and caused occasional numbness in her toes as well as feelings of instability. (A.R. 489-92.) A MRI on May 28, 2010, showed an irregular retromalleolar fibular groove which could predispose Plaintiff to peroneus tendon dislocation and irritation. (A.R. 492.)

Following a July 26, 2010 visit with Dr. Serynek, Plaintiff underwent surgical ligament repair on her left ankle four days later. (A.R. 430-46, 485-89.) According to hospital records, Plaintiff's surgery was without complications and she was discharged to home with a scheduled follow up visit with Dr. Serynek. (A.R. 433-34.)

August 19 and September 15, 2010 notes from post-operative visits with Dr. Serynek indicated Plaintiff's foot and ankle were in good alignment and without valgus instability. (A.R. 479-88.) Dr. Serynek noted the same progress in an October 5, 2010 visit. (A.R. 475-78.) By November 1, 2010, Dr. Serynek was recommending that Plaintiff wean from her post-operative bootwalker for a brace or normal shoe. (A.R. 471-72.)

Plaintiff continued with physical therapy, though she reported no improvement in her symptoms. (A.R. 631-50, 655-60, 668-70, 727-36.) In notes from a December 22, 2010 consultation with Dr. William Pfeiffer, M.D., Plaintiff reported that she experienced a significant worsening in pain following the ligament reconstruction in July 2010. (A.R. 653.) Plaintiff's worsening symptoms included numbness and tingling in her toes and skin hypersensitivity. (A.R. 653-54.) Notes from this visit indicate that Plaintiff likely suffered from complex regional pain syndrome. (A.R. 654.) Dr. Pfeiffer encouraged Plaintiff to gradually add more and more activities and increased weight bearing on her left ankle while also attempting to wean off the crutches and supportive footwear as much as possible. (Id.)

16cv1277-WQH (PCL)

Plaintiff was referred to an anesthesia pain management clinic as a candidate for nerve block therapy. (Id.)

Dr. Michael McBeth, M.D., examined Plaintiff on February 8, 2011, and reported that Plaintiff had impressive demineralization in her left ankle, suggesting substantial long term altered weightbearing. (A.R. 677.) In his assessment, Dr. McBeth noted that Plaintiff suffered from moderate complex regional pain syndrome type 1 in the left lower extremity. (Id.) Dr. McBeth noted that Plaintiff should continue with physical therapy and recommended a left lumbar sympathetic block. (A.R. 678.) Plaintiff underwent a fluoroscopic guided left lumbar sympathetic block on March 9 and March 16, 2011. (A.R. 688, 737.) Notes following the first block indicate that Plaintiff "tolerated the procedure well, and was able to move from the bed to the wheelchair without difficulty." (Id.)

Plaintiff again presented to Dr. McBeth on April 6, 2011, reporting that the sympathetic block did not provide relief. (A.R. 737.) At that time Plaintiff reported a poor quality of life and that she experienced great limitations walking. (Id.) Among the recommended treatments for Plaintiff's pain was a recommendation for Plaintiff to participate in acupuncture and a Boston Scientific spinal cord simulator, which was implanted on August 16, 2011. (A.R. 742, 789.) Follow up recommendations after the implant included walking daily, wearing a binder for two weeks, and decreasing nerve pain medication. (A.R. 792.) On September 12, 2011, Plaintiff contacted Dr. McBeth's office to ask if she was permitted to "do some walking for about a mile and a half." (A.R. 793.) Dr. McBeth's follow up notes from a September 26, 2011 visit indicate that Plaintiff's "symptomatology has improved overall with current treatment parameters." (A.R. 803.)

On January 7, 2012, Plaintiff was admitted to the hospital following an "episode of loss of consciousness and bilateral lower extremity weakness." (A.R. 551.) During the episode, Plaintiff's eyes rolled back and "she became nonverbal and … [experienced] total body shaking and tremors for about 10 minutes." (A.R. 556.) Plaintiff reported that following regaining consciousness, she experienced difficulty moving her legs. (A.R. 552.) Plaintiff reported no leg numbness but could not lift them against gravity and could not

stand to walk herself to the restroom. (<u>Id.</u>) Doctors suspected that Plaintiff's episode was not seizure-related and more likely a vasovagal episode. (A.R. 557.) Dr. Jerry T. Tseng, M.D., noted that Plaintiff likely injured her cervical cord or thoracic spine when she fainted. Dr. McBeth suggested that an implant malfunction was to blame, and so the implant was turned off. (<u>Id.</u>) Treatment notes indicate that doctors believed that the root cause of the episode was "some stressor with [Plaintiff's] husband retiring the day of the episode." (<u>Id.</u>) Doctors predicted that Plaintiff would fully recover in the coming days and weeks. (<u>Id.</u>) Plaintiff was instructed to follow up with Dr. McBeth with respect to her implant and she was discharged to extended care on January 13, 2012. (A.R. 557-58.)

An image of Plaintiff's ankle and foot was taken on May 1, 2012, revealing a mild degree of osteoarthritis at a joint in the first toe. (A.R. 914.) The x-ray also showed that the "remainder of the bony structures appear normal." (<u>Id.</u>) Imaging on July 25, 2012, revealed no significant or unusual arthritic or degenerative changes in the feet. (A.R. 920-21.) As of that date, notes indicate the electronic stimulator implant was no longer giving Plaintiff relief. (A.R. 921.)

Treatment notes from August 21, 2012, show that Plaintiff was experiencing difficulty sleeping, usually averaging around three hours each night. (A.R. 944.) Additionally, the note indicated that Plaintiff was not taking her pain medication. (<u>Id.</u>) Plaintiff continued to exhibit pain and hypersensitivity in her left foot due to complex regional pain syndrome, complicated by decreased strength and range of motion through to June 12, 2014, the date of her last medical records in evidence. (A.R. 935- 1349.) By March 2013, Plaintiff was also suffering from pain in her knees, though x-ray images showed only mild narrowing of the medial joint compartments. (A.R. 1298-1300.)

State Agency Medical Consultant Dr. G. Lockie, M.D., completed a Physical Residual Functional Capacity Assessment on November 30, 2010. (A.R. 507-16.) For exertional limitations, Plaintiff was limited to occasionally lifting twenty pounds and frequently lifting ten pounds. (A.R. 508.) Plaintiff could stand or walk for at least two hours and sit for about six hours in an eight-hour workday. Plaintiff was limited in using her

lower extremities to push and/or pull. (Id.) Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl and occasionally climb ladders, ropes, and scaffolds. (A.R. 509.) Dr. Lockie found no manipulative, visual, communicative, or environmental limitations. (A.R. 509-10.) In making his assessment, and after reviewing Plaintiff's medical record, Dr. Lockie reported that while Plaintiff had functional limitations due to a traumatic event, medical findings after Plaintiff's date last insured show improvement and "do not appear to support a condition that significantly limits or even a less than [sedentary] [residual functional capacity] for [twelve] months. (A.R. 515.) As a result, Dr. Lockie suggested that at the time of her date last insured, Plaintiff was capable of a sedentary residual functional capacity and not precluded from all work. (Id.)

Dr. Michael McBeth, M.D., completed a Physical Residual Functional Capacity Questionnaire on October 10, 2011. (A.R. 924-25.) Dr. McBeth indicated that during an eight-hour workday, Plaintiff would experience pain or other symptoms related to her impairments constantly. (A.R. 924.) Plaintiff was limited to standing or walking less than two hours in an eight-hour workday and could stand for at least six hours. (Id.) Further, Dr. McBeth noted that Plaintiff would need to have her foot or leg elevated for ten minutes per hours. (A.R. 925.) Dr. McBeth recommended that Plaintiff be restricted to occasionally bending and rarely stooping, climbing, kneeling, or crawling. When asked if Plaintiff would have difficulty sustaining full time work and why, Dr. McBeth noted "yes – 1) Pain, 2) Difficulty Concentrating.) (Id.)

Treating physician Dr. Cynthia Sorrell, M.D., completed a Physical Residual Functional Capacity Questionnaire on October 8, 2012. (A.R. 926-27.) Dr. Sorrell indicated that Plaintiff's pain affected Plaintiff's ability to work and that she would experience pain constantly during an eight-hour workday. (A.R. 926.) Dr. Sorrell limited Plaintiff to rarely carrying less than ten pounds and never carrying more. Further, Dr. Sorrell indicated Plaintiff would be able to sit, stand, or walk for less than two hours in an eight-hour workday. (Id.) Dr. Sorrell recommended Plaintiff rarely bend or stoop and never climb, kneel, or crawl. (A.R. 927.) Further, Dr. Sorrell noted that Plaintiff is in constant

pain, which impacts her sleep, ultimately leading to difficulty for Plaintiff to sustain full time work. (Id.)

Dr. Sorrell completed a second Physical Residual Functional Capacity Questionnaire on June 10, 2014. (A.R. 930-931.) This second form only varies from the first in that Plaintiff was restricted from lifting and carrying any weight and was no longer able to stoop. (Id.)

Dr. Ji Yoo, M.D., completed a Mental Impairment Questionnaire on June 11, 2014. (A.R. 932-34.) Dr. Yoo indicated Plaintiff suffered from a depressive disorder and long term chronic pain, worsening in condition. (A.R. 932.) Dr. Yoo noted that Plaintiff suffers from pervasive loss of interest in almost all activities, decreased energy, generalized persistent anxiety, persistent disturbances of mood or affect, apprehensive expectation, memory impairment, and sleep disturbance. (A.R. 932-33.) In terms of Plaintiff's mental ability and aptitude, Dr. Yoo concluded that Plaintiff is seriously limited but not precluded in asking simple questions or requesting assistance and getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (A.R. 933-934.) Plaintiff is unable to meet competitive standards in remembering work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, maintaining regular attendance and being punctual within customary or unusually strict tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being unduly distracted, accepting instructions and responding appropriately to criticism from supervisors, and interacting appropriately with the general public. (Id.) Finally, Dr. Yoo found Plaintiff to have no useful ability to function in terms of maintaining attention and concentration for two hour segments, completing a normal workday and workweek without interruptions from psychologically based symptoms, and responding appropriately to changes in a routine work setting. (Id.) Ultimately, Dr. Yoo opined that Plaintiff was unable to work at all. (A.R. 934.)

16cv1277-WQH (PCL)

Dr. McBeth completed a second Physical Residual Functional Capacity Questionnaire on July 2, 2014. (A.R. 1350-1351.) Dr. McBeth indicated that Plaintiff would be able to lift and carry ten or fewer pounds, rarely carry twenty pounds, and never carry fifty pounds. (A.R. 1350.) Plaintiff would be able to sit for at least six hours and stand or walk for less than two hours in an eight-hour workday. (Id.) Dr. McBeth noted that Plaintiff could occasionally bend, rarely stoop and climb, and never kneel or crawl. (A.R. 1351.) Dr. McBeth noted that Plaintiff would have difficulty concentrating due to her pain, which would cause difficulty sustaining full time work. (Id.)

B. Administrative Hearings

For the purpose of completeness, the Court examines the record from both administrative hearings, i.e., Plaintiff's first application denial as well as the second, from which she now appeals. In the interest of brevity, however, the summary of Plaintiff's first denial is abbreviated.

1. First Hearing – ALJ Parker

On August 9, 2012, ALJ Larry B. Parker conducted a hearing to determine Plaintiff's disability claims. (A.R. 59-76.) Plaintiff appeared in person, represented by her attorney, Anthony J. DeLellis. Medical Expert Dr. Arthur Brovender, M.D. and Vocational Expert John P. Kilcher also testified. (Id.)

a). Plaintiff's Testimony

Plaintiff testified that she experienced pain in her left ankle that traveled up her left calf and into her back, shoulders, and neck. (A.R. 68.) Plaintiff indicated that the spinal cord implant from August 2011 was successful "at the time" but that in November 2011 she began to experience other symptoms that led to her spending two days in the hospital. (Id.) Plaintiff believed that her illness was unrelated to the spinal cord stimulator implant. (Id.) Plaintiff testified that her ankle pain began to get worse, feeling similarly to how it felt before the implant, and she experienced difficulty walking. (A.R. 68-69.) Plaintiff reported she had been dealing with swelling in her left foot since 2009. Plaintiff described her foot and ankle pain as "excruciating." (A.R. 69.)

Plaintiff testified that she takes Vicodin and morphine, but that they are ineffective at treating her pain. (A.R. 70.) Plaintiff sees doctors regularly but she was informed by her podiatrist that there was nothing that could be done for her progressively worsening pain. (Id.) Plaintiff also testified that her lower back pain makes sitting and walking difficult and that she can sit for only ten minutes before the pain becomes excruciating and her feet get numb. (A.R. 71.) To assist with walking, Plaintiff uses a cane and can only walk without one if she has something else to hold onto. (Id.)

As to her ability to work, Plaintiff testified that she struggles to pay attention and function in her everyday life. (A.R. 72.) When asked if she believed she was able to work, Plaintiff testified that she did not, as she struggled with both sleeping and walking and was unable to do anything around the house. (A.R. 69.)

### b). Medical Expert Testimony

Dr. Arthur Brovender, M.D., testified regarding his analysis of the medical evidence. (A.R. 63-67.) Dr. Brovender first reviewed and summarized the medical record from which he based his determinations. (A.R. 64-65.) Dr. Brovender then indicated that Plaintiff likely met a listing "for a time…a closed period." (A.R. 65.) Dr. Brovender then defined that closed period as September 30, 2009 to August 16, 2011. ALJ Parker accepted Dr. Brovender's statement regarding the listed impairment determination without asking the Medical Expert to define what specific listing Dr. Brovender was referencing or fleshing out what medical evidence established the listing. ALJ Parker then asked Dr. Brovender what level of work Plaintiff would be able to perform after August 16, 2011 and Dr. Brovender testified that Plaintiff could sit for six to eight hours and stand or walk for two hours; lift ten pounds frequently and twenty pounds occasionally; bend, stoop, squat, and kneel occasionally; and should avoid ropes, ladders or scaffolds, and unprotected heights. (A.R. 65-66.) Dr. Brovender also indicated Plaintiff had no limitation of reaching overhead or fine or gross manipulation. (A.R. 66.) When examined by Plaintiff's attorney, Dr. Brovender indicated that Plaintiff's complex regional pain syndrome from September 2011 was "something [that] she had," but that had "improved." (A.R. 66-67.)

### c). Vocational Expert Testimony

Vocational Expert John P. Kilcher classified Plaintiff's last relevant work as a front desk receptionist as light and semi-skilled work. (A.R. 73.) Plaintiff's past work as a teacher assistant was also light and semi-skilled work. (Id.) Mr. Kilcher further testified that Plaintiff's work as a receptionist for a property management company was sedentary, light, and semi-skilled work. (A.R. 74.) ALJ Parker proposed the following hypothetical to Mr. Kilcher: a hypothetical younger person, who could lift twenty pounds occasionally and ten pounds frequently, could stand and walk two out of eight hours a day and sit six hours out an eight-hour workday and was limited to occasional ladders, ropes, scaffolds. Mr. Kilcher testified that the hypothetical described a sedentary residual functional capacity and that the hypothetical individual would be able to work as a receptionist. (A.R. 74-75.) Plaintiff's attorney did not propose any additional hypotheticals for the Vocational Expert. (A.R. 75.)

### 2. ALJ Parker's Decision

Following the August 9, 2012 hearing ALJ Parker issued his decision on August 28, 2012. (A.R. 87-101.) ALJ Parker concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act from August 11, 2009 through the date last insured, September 30, 2009. (A.R. 90.) ALJ Parker determined that Plaintiff had the severe impairments of status post left lateral ankle ligament reconstruction and peroneal debridement, complex regional pain syndrome of the left lower extremity; chronic low back pain; and osteoarthritis of the MCP joint of the first toe bilaterally. (A.R. 92.) Despite these impairments, ALJ Parker noted that no physician opined that Plaintiff's condition met or equaled a listed impairment and that state agency physicians opined that it did not. (A.R. 93.)

ALJ Parker further determined Plaintiff had the residual functional capacity to perform sedentary exertional work with the following limitations: lift and carry ten pounds frequently and twenty pounds occasionally; sit for a total of six hours in an eight-hour

workday; stand or walk for a total of four hours in an eight-hour workday; occasionally bend; no climbing ropes; and no exposure to unprotected heights. (A.R. 93.)

ALJ Parker found that Plaintiff's medically determinable impairments could reasonably cause the alleged symptoms, however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were inconsistent with the residual functional capacity assessment. (A.R. 94.) For example, ALJ Parker noted that despite her allegations of total disability, Plaintiff experienced a vast improvement following spinal cord stimulation and that she was considered back to "baseline." (Id.) ALJ Parker also noted that the record did not show that Plaintiff required special accommodations to relieve her pain or other symptoms. (Id.) Further, ALJ Parker noted that Plaintiff did not exhibit significant atrophy other than her left calf and that there was no loss of strength in the lower extremities. (Id.)

ALJ Parker afforded significant weight to Dr. Brovender's testimony, who factored the success of Plaintiff's spinal cord stimulation into consideration in making his residual functional capacity determination. (A.R. 94.) According to ALJ Parker, Dr. Brovender's opinion was consistent with progress notes and treating source statements. (A.R. 95.)

### 3. Second Hearing – ALJ Benham

Following the Appeals Council remand, a second hearing was held on July 17, 2014, before ALJ Eric v. Benham. (A.R. 27-57.) Plaintiff appeared in person, again represented by Mr. DeLellis. (Id.) Dr. Brovender again testified as Medical Expert along with Vocational Expert Robin Scher. (Id.)

### a). Plaintiff Testimony

Plaintiff testified that she last worked in August 2008 as a receptionist for a property manager. (A.R. 40.) Plaintiff reviewed her past work as an on-call teacher assistant, receptionist at a casino, and receptionist at her former church. (A.R. 40-41.) Plaintiff also testified that she worked as a certified nurse assistant as recently as 1997, and that she had not done nurse assistant work since. (A.R. 42.) Plaintiff further indicated that in 2003 she

served as a daycare provider for up to eight children. (Id.) Plaintiff estimated that the heaviest child she took care of weighed approximately thirty pounds. (A.R. 53.)

Plaintiff testified that she sprained her ankle while in Walmart in August 2009. (A.R. 43.) While she suffered other injuries, Plaintiff testified that the left ankle sprain was the most serious. (Id.) Plaintiff testified that after switching to a different medical provider's service in January 2010, she sought medical attention because her ankle was not getting better. Plaintiff continued to seek help for her ankle, eventually resulting in surgery in July 2010. (A.R. 44.) Plaintiff testified that at that time she was unable to put any weight on the foot and following the surgery she used crutches for ten months. (Id.)

Plaintiff testified that she was diagnosed with complex regional pain syndrome in her left leg in October or November of 2010. (A.R. 45.) Plaintiff testified that at that time her pain was always at an eight or nine, but that before it was off and on, sometimes completely disappearing and other times up to ten out of ten. (A.R. 45-46.) Plaintiff testified that her complex regional pain syndrome has been treated with spinal blocks and that she sees Dr. McBeth for pain management. (A.R. 46.)

Plaintiff further testified that she has pain across her lower back and that the pain from her complex regional pain syndrome causes her so much pain that she avoids touching sheets or blankets while she sleeps and that she experiences swelling and color changes in her toes and heels. (A.R. 46-47.) Plaintiff indicated that the pain she experiences is constant and that she sleeps about three hours a night. (A.R. 47.) Plaintiff testified that doctors have as of yet been unable to even temporarily relieve her pain at any level. (Id.)

Plaintiff testified that she was able to stand for only fifteen minutes, but struggles to stand from a seated position because of her knees. (A.R. 48.) When Plaintiff sits, she elevates her leg, and estimated that she spends between five and six hours a day in that position. (A.R. 48-49.)

///

///

///

### b). Medical Expert Testimony

Dr. Brovender testified that he reviewed all the medical evidence in the updated administrative record and then once again summarized the information contained within. (A.R. 31-34.) Dr. Brovender then indicated that he considered the possibility of Plaintiff's impairments meeting the qualifications for listing 1.04a for her back and neck, but that her impairments did not meet or equal the listing. (A.R. 34.) Dr. Brovender testified that he also considered listing 1.02a, but that she also did not meet or equal that listing. (Id.) Dr. Brovender indicated that in terms of functional limitations, Plaintiff had no limitation sitting, could stand for three hours and walk for three hours, and that she would be able to lift ten pounds frequently and occasionally up to thirty pounds. (A.R. 34-35.) Dr. Brovender testified that Plaintiff has no limitations reaching overhead or with gross or fine manipulation and that she is limited to occasional bending, stooping, squatting, and kneeling. (A.R. 35.) Dr. Brovender further testified that Plaintiff was restricted from ropes, ladders and scaffolds, or unprotected heights, but that she could go up stairs and ramps occasionally. (Id.)

When ALJ Benham asked Dr. Brovender if he believed Plaintiffs functional limitations would apply from the entire time since Plaintiff's alleged onset date in August 2009, Dr. Brovender indicated that Plaintiff's impairments were post-operative, originated in March of 2010, and that her sprained ankle from August 2009 alone would not significantly affect her ability to stand or walk. (A.R. 35-36.)

Plaintiff's attorney spoke with Dr. Brovender as to the expert's understanding of Plaintiff's medical records. (A.R. 37.) After confirming that Dr. Brovender had considered all of Plaintiff's medical records in making his determination as to Plaintiff's impairments, Plaintiff's attorney did not question Dr. Brovender further. (A.R. 40.)

### c). Vocational Expert Testimony

In addition to categorizing Plaintiff's past receptionist jobs, Vocational Expert Robin Scher categorized Plaintiff's past work in child care as a child monitor, a medium strength level job. (A.R. 52-53.) The ALJ proposed the following hypothetical to Ms. Scher:

assuming a person of the same age, education and prior work experience as Plaintiff, who could lift and carry as much as twenty pounds occasionally and ten pounds frequently, could stand and walk for two hours out of an eight-hour workday and could sit six hours in an eight-hour workday, occasionally stooping, crouching, kneeling, crawling, or climbing stairs, could that hypothetical individual do any of Plaintiff's past work? (A.R. 53-54.) The vocational expert testified that such an individual would be able to return to Plaintiff's past work as a receptionist as it is customarily performed. (A.R. 54.) Additionally, Ms. Scher testified that the hypothetical person would also be able to work as a cashier, telephonic solicitor, and document preparer in microfilming. (Id.)

### 4. ALJ Benham's Decision

On September 29, 2014, ALJ Benham issued his decision regarding the July 17, 2014 hearing. (A.R. 10-26.) ALJ Benham ruled that Plaintiff was not under a disability within the meaning of the Social Security Act from August 11, 2009, through the date last insured. (A.R. 14.)

ALJ Benham conducted the five-step disability analysis set forth in 20 C.F.R. §§404.1520(a)(4). (A.R. 14.) At step one, ALJ Benham found that Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2009 and had not engaged in substantial gainful activity during the period from her alleged onset date of August 11, 2009 through her date last insured, September 30, 2009. (A.R. 15.) At step two, ALJ Benham found that through the date last insured, Plaintiff had severe impairments of left ankle sprain and strain. (Id.) At step three, the ALJ determined that none of Plaintiff's impairments or combination of impairments met or equaled any impairment listed in 20 CFR Part 404, Subpt. P, App. 1 (the Listings). (A.R. 16.) ALJ Benham next determined that Plaintiff retained the residual functional capacity to perform light and sedentary work with the following restrictions: lifting and carrying twenty pounds occasionally and ten pounds frequently; standing or walking for two hours in an eight-hour workday; sitting for six hours in an eight-hour workday; and occasionally stooping, crouching, kneeling crawling and climbing stairs. (Id.) At step four, ALJ Benham found that through the date

last insured, Plaintiff was capable of performing her past relevant work as a receptionist. (A.R. 19.) Because ALJ Benham found that Plaintiff was able to perform past relevant work at step four, he did not include a step five finding of whether other jobs existed in significant numbers in the national economy that Plaintiff was capable of performing. (A.R. 19-20.) As a result of the analysis, the ALJ concluded that Plaintiff was not disabled as defined by the Act. (A.R. 20.)

ALJ Benham weighed the evidence in Plaintiff's case as follows. First ALJ Benham established that while the medical record was significant, only three exhibits related to the period prior to the date last insured, 1F (A.R. 356-80), 2F (A.R. 381-86), and 5F (A.R. 447-67) (A.R. 17.) ALJ Benham reviewed these three exhibits, detailing Plaintiff's sprained ankle after a fall in Walmart on August 11, 2009. (Id.) By September 18, 2009, Plaintiff "was in no acute distress on exam" and displayed a full range of motion with some tenderness but no instability. (Id.) Despite improvement, Plaintiff's pain continued and she was again diagnosed with sprain and strain in October 2009. In July 2010, ten months after the expiration of Plaintiff's date last insured, Plaintiff had surgery to repair the ligament in her left ankle. (Id.) ALJ Benham notes that Plaintiff developed complex regional pain syndrome after this surgery and that "a number of assessments find [Plaintiff] unable to function physically or mentally" as a result of the syndrome. (Id.)

In assessing Plaintiff's credibility, ALJ Benham noted that Plaintiff's treatment before the expiration of her date last insured was "essentially routine and/or conservative in nature." (A.R. 17.) Further, diagnostic studies were essentially unremarkable prior to September 30, 2009. Plaintiff was not taking medication, prescribed or over the counter, to treat her pain, according to progress notes, until November 2011, leading ALJ Benham to find that Plaintiff's pain was not as severe as she suggested. (Id.) ALJ Benham also takes care to note that the medical record "does not contain any opinions from treating physicians indicating that [Plaintiff] was disabled or even had limitations greater than those determined in [the ALJ's denial determination] prior to expiration of her date last insured." (Id.) Additionally, ALJ Benham noted that Plaintiff's work record was spotty long before

her alleged inability to work. "Her failure to work for years at her full capacity when she could have done so reflects poorly on her motivation for gainful employment regardless of any alleged limitations." (Id.)

ALJ Benham summarized Medical Expert Dr. Brovender's testimony as to Plaintiff's impairments and Dr. Brovender's determination that before Plaintiff's surgery, she was able to stand and walk for six hours in an eight-hour workday. (A.R. 18.) After the surgery, and well after the expiration of Plaintiff's date last insured, Dr. Brovender still believed that Plaintiff retained the residual functional capacity to do light work with no climbing of ropes or ladders and occasional postural limitations with standing and walking limited to three hours in an eight-hour workday. (Id.) ALJ Benham set forth his analysis of Dr. Brovender's two testimonies as follows:

> Although Dr. Brovender may have provided some differing testimony at a prior hearing, clinical signs and findings do not support any listing level impairment or disabling impairment by [Plaintiff's] date last insured. The evidence is clear by diagnosis, exam findings and prescribed treatment that [Plaintiff] had no disabling impairment on or before September 30, 2009. Specifically, she was diagnosed with only a sprain/strain of the left ankle, diagnostic imaging was unremarkable, she had no significant and persistent neurologic deficits and was advised to wean off a cam boot and go to physical therapy. Although the evidence of record definitely shows a worsening of [Plaintiff's] left ankle impairment as well as a development of other significant impairments after September 30, 2009, it does not support disabling signs or symptoms on or before that date.
> I give Dr. Brovender's opinions some weight. Specifically, while I agree that [Plaintiff's] left ankle strain and sprain did not prevent all work activity by her date last insured as supported by the evidence showing no instability or significant and persistent neurologic deficits and unremarkable imaging, in light of her need to use a cam boot and participate in physical therapy, the evidence is more consistent with the retained capacity for no more than two hours of walking or standing in an eight-hour workday.

(A.R. 19.)

Overall, ALJ Benham found that objective medical evidence did not support the claimant's allegations of a disabling physical impairment or combination of impairments and related symptoms. (A.R. 16.)

With respect to Plaintiff's past work, ALJ Benham found that Plaintiff's work as a receptionist qualifies as past relevant work as Plaintiff performed the job "long enough to learn it and within [fifteen] years from the date of adjudication, and her work earnings were at substantial gainful activity levels for the years she performed each job." (A.R. 19.)

## IV. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) he suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. § 423 (d)(1)(A) (West 2004). An applicant must meet both requirements to be "disabled." Id.

### A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F. 3d 1094, 1098-99 (9th Cir. 1999).

///

///

### B. Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 2001); Desroisers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Id. (citation and quotations omitted). "A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A §405(g). This matter may also be remanded to the Social Security Administration for further proceedings. Id.

## V. DISCUSSION

The sole issue Plaintiff presents is that ALJ Benham committed legal error in his evaluation of Medical Expert Dr. Brovender's testimony from the first administrative hearing before ALJ Parker. (Doc. 17-1 at 9-14.) Despite Plaintiff's contention that ALJ Benham's reasons for giving Dr. Brovender's opinion some weight lack logic and rationality, the Court finds that the weight given to Dr. Brovender's opinion is legally sufficient.

In evaluating medical source opinions, the Ninth Circuit generally holds that greater weight is to be given to the opinion of an examining physician over the opinion of a non-

examining physician. See Andrews, 53 F.3d at 1041 (9th Cir. 1995). "Because non-examining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." 20 C.F.R. § 404.1527. The ALJ should, at the very least, provide "specific and legitimate" reasons in the decision for either expressly or implicitly rejecting the opinions of a medical expert or examining physician. Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir. 1996)

Here, Plaintiff asserts that ALJ Benham "rejected" Dr. Brovender's opinion by failing to, essentially, blindly accept a singled-out portion of Dr. Brovender's testimony from the first hearing that best favors a finding of disability. On the contrary, ALJ Benham indicated that Dr. Brovender's non-examining opinion from the first hearing was not supported by clinical findings, nor supported any listing-level or disabling impairment by September 30, 2009. ALJ Benham stated that it was clear by diagnosis, exam findings, and prescribed treatment plan that Plaintiff's impairments did not totally preclude her from all work before September 30, 2009. At the second hearing ALJ Benham specifically asked Dr. Brovender if he thought Plaintiff's impairment met or equaled a listing and Dr. Brovender testified that while he considered listings 1.02a and 1.04a, Plaintiff's impairments did not rise to that level before the date last insured. Dr. Brovender testified that, in his expert opinion, Plaintiff's more serious and disabling impairments were post-operative, which means that they did not functionally preclude Plaintiff from working until after March 2010, if not later. ALJ Benham conceded that Plaintiff's impairments have progressively worsened since the spinal stimulation implant, however he also noted that no medical records or opinions from the applicable period between August 11, 2009 and September 30, 2009 support the position that Plaintiff was totally disabled.

Additionally, Plaintiff contends ALJ Benham substituted his own interpretation of the medical evidence in place of the opinion of medical professionals, i.e., Dr. Brovender. It is, however, the providence of the ALJ to make an ultimate determination as to disability for the purposes of awarding benefits. Here, ALJ Benham indicated that Dr. Brovender's

16cv1277-WQH (PCL)

opinion was given some weight because Plaintiff's symptoms supported a residual functional capacity with less time spent walking and standing than what Dr. Brovender opined Plaintiff was capable of. While Plaintiff does not explicitly demand that Dr. Brovender's 2012 testimony receive controlling weight above all other medical evidence and opinion, that is impliedly Plaintiff's request. Plaintiff argues ALJ Benham isolated portions of the record in favor of denying benefits and cautions against cherry-picking and then encourages the Court to overlook Dr. Brovender's 2014 testimony in its entirety.

On remand, ALJ Benham was under no obligation to credit Dr. Brovender's first testimony as entirely true, find that Plaintiff's impairments met or equaled a listing, and award benefits. ALJ Benham was also not tasked with determining Plaintiff's present-day residual functional capacity. The Appeals Council directed ALJ Benham to give further consideration to and explain the weight given to Dr. Brovender's nontreating source opinion and obtain supplemental evidence from a medical examiner to clarify the nature and severity of Plaintiff's impairment and possible onset date. Dr. Brovender did exactly that, and because ALJ Benham found Plaintiff's condition, through September 30, 2009, to be more limiting than Dr. Brovender did, his opinion was afforded some weight. Substantial evidence in the record supports ALJ Benham's finding that through Plaintiff's date last insured, Plaintiff's residual functional capacity supported returning to work as a receptionist.

## VII. CONCLUSION

For the reasons set forth above, the Court recommends granting Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for Summary Judgment.

This report and recommendation is submitted to the Honorable William Q. Hayes pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **August 18, 2017**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **September 1, 2017**. The parties are advised that failure to

file objections within the specific time may waive the right to appeal the district court order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED

Dated:  August 4, 2017

Hon. Peter C. Lewis
United States Magistrate Judge